LOWENSTIEN & BROS. ET AL. *v.* MAX ABRAMSOHN.

1. EQUITY JURISPRUDENCE.   *Jurisdiction.*

When personal property has been attached in the hands of a purchaser by creditors of the seller, equity has jurisdiction of a bill by such purchaser against the sheriff and attaching creditors for the recovery of the proceeds of a subsequent sale under the attachments to the extent of the debt satisfied by complainant's purchase.

2. CONVEYANCE FOR PRE-EXISTING DEBT.   *Overvaluation.*

If a purchaser buy a stock of goods without actual intent to defraud, in satisfaction of a pre-existing debt, his purchase will not be condemned as fraudulent alone because shortly afterwards the goods were sold under attachments for forty per centum more than the debt and above their value.

FROM the chancery court, second district, Coahoma county. HON. A. H. LONGINO, chancellor.

Abramsohn, the appellee, was the complainant in the court below; the appellants, Lowenstien & Bros. and others, were defendants there.

One Brenner, a merchant, owed appellee $2,793.51; Brenner becoming involved, appellee delivered the notes evidencing the debt to his attorney for collection, vesting him with full discretion; the attorney went to Dublin, the place of the debtor's business, arriving there at night, and after negotiations, on the same night, accepted a stock of goods from Brenner in payment of the notes, and Brenner surrendered possession; the attorney put up Abramsohn's sign and placed one Dancey in charge for Abramsohn. Lowenstien & Bros. and others, appellants, attached the property on the ground that Brenner had disposed of his property with intent to defraud his creditors. Dancey, the person left in charge of the goods as appellee's agent told Allen, a merchant in Dublin, that the stock of goods would be disposed of at cost, if Abramsohn secured it, and Allen determined to buy the stock to prevent the competition of such a sale in the village. The stock was put up for sale at auction by the sheriff, under the attachments, and there were a number of bidders until the price of $2,500 was reached, after which Abramsohn and Allen were the only bidders, and finally Allen bid $3,800, and secured the goods. Abramsohn then (judgments not having been rendered in the attachment suits) filed his bill in the chancery court bringing in all the parties, asking that the sheriff be decreed to pay over to him the amount which he had paid for the goods by consenting to the satisfaction of his pre-existing debt, and he would "bow out" and leave the balance to be disposed of as the court should see proper to decree. On final hearing there was a decree according to the prayer of the bill, from which the attaching creditors, defendants below, appealed to the supreme court.

*Butt & Butt,* for appellants.

If, in view of the facts, complainant's pretended purchase be permitted to stand, then no contract between a creditor and an insolvent debtor should be disturbed, however fraudulent. Did this deal tend to hinder or delay other creditors in making their money in whole or in part? There can be but one answer, that it did, and that is conclusive of the whole case. Another feature of fraud and wrong is the attorney's fee claimed, $253.57. No attorney's fees are allowable under the facts of the case. There was no collection of money or its equivalent, simply a purchase of goods, which any one could have done as well as an attorney, and nothing paid out by the holder of the notes. The thing done, for which an attorney's fee is claimed, is wholly and absolutely outside of any professional line. The bill admits that the contract with Brenner by appellee was void in part. Complainant offers to release in part the proceeds of the goods so claimed to be purchased because in excess of all he claimed against Brenner. This is a thin subterfuge. The contract, if anything, was an entirety and cannot be divided up. The whole must stand or the whole must fall. The rotten material in one part of the structure condemns the whole—the fly in the ointment. The law is clear and well settled along this line, as we think, and we will not vex the court with authorities, as they are numerous and well known to the court. However, we cannot avoid reference to the case of *Selleck* v. *Pollock,* 69 Miss., 870, s. c. 13 So. Rep., 248, in this court, showing the beautiful harmony of human and divine law, whether great or small acts, whether intentional or unintentional fraud, whether in law or fact, the same fly ruins the whole jar of ointment, the good cannot be eliminated from the bad.

It is clear in our judgment that the writ of injunction should not have been granted, and that the demurrers should have been sustained and the bill dismissed. The bill shows that the attachment suits were pending in the circuit court, and that

said court had full and complete jurisdiction of every question involved. The bill does not show the slightest common interest in the several appellants. Each plaintiff had a perfect right under the statute to a separate trial upon the claimant's issue. They were all separate and distinct suits; wholly different parties, having no kind of interest in common.

*C. L. Sively* and *Perkins & Winston*, for appellee.

There are but two questions in this case: one a question of substantive right, and the other a question of remedy. They are:

(1) What are the rights of a creditor of an insolvent, who, in good faith, honestly believing that he was only purchasing goods to the value of the amount of his debt, takes a conveyance of property in satisfaction thereof, which, by reason of exceptional and extraordinary circumstances not foreseen at the time of the purchase, nor, at that time, reasonably to be anticipated, shortly thereafter realized, upon the actual sale, a sum considerably in excess of the amount of the debt extinguished by the transaction.

(2) May such a creditor, when the property has been seized under a large number of attachments at law, all seeking to subject it to the payment of their respective demands, upon the common ground that the conveyance was made to hinder, delay and defraud his creditors, sustain a bill in equity enjoining the attachments, upon releasing to the attaching creditors, according to the priorities of their respective levies, all of the property over and above the amount of his debt, extinguished by the purchase from the insolvent.

There can be no question about the correctness of the chancery court's conclusion in entertaining and maintaining jurisdiction of this suit, for the purpose of preventing a multiplicity of suits.

Here there were nine attachment suits, levied successively upon the property purchased by Abramsohn; all of the cases

depended upon a common state of facts, a common principle of law, which governed the rights of all; and while there was on community of right between the several plaintiffs who levied their attachments, there was a common pursuit of the same fund, in the hands of the sheriff, thus making a community of interest in the subject matter of controversy. There was no reason why Abramsohn should be required to file a claimant's affidavit for each of the respective attachment suits, and contest his right at law between all the parties in attachment, when he could settle the entire matter, by one suit in chancery. *Bishop* v. *Rosenbaum*, 58 Miss., 84; *Pollock* v. *Okolona Savings Institution*, 61 Miss., 293; Pomeroy's Equity Jurisprudence, secs. 243–275; *Tribette* v. *Railroad Co.*, 70 Miss., 182; 1 Pomeroy's Equity, sec. 245; 1 Pomeroy's Equity, sec. 274; *Hyman* v. *Wheeler*, 33 Fed. Rep., 629; *Railroad Co.* v. *Dyer*, 1 Saw. 641.

Unless the mere fact that the property purchased, by reason of extraordinary and unforeseen circumstances, actually sold for forty per centum more than the debt which was extinguished by Abramsohn's purchase is, of itself, sufficient to cast upon Abramsohn the burden of proving his *bona fides* as to every element of the sale under which he acquired the title, or unless that burden is upon him because he is the complainant, then there is nothing in the record making it necessary for him to offer such proof, because the attaching creditors have utterly failed to show anything whatever questioning the good faith of Brenner himself. Under the doctrine announced in *Preston* v. *Threefoot*, 2 Miss. Dec., 45, there would be no burden upon the alleged fraudulent grantee to show the *bona fides* of his purchase until evidence had first been introduced tending to establish a fraudulent purpose on the part of the alleged fraudulent grantor.

But we assume, without admitting that the consideration for the conveyance from Brenner to Abramsohn, having, contrary to the honestly mistaken judgment of Abramsohn's attorney,

turned out to be considerably less than the real value of the property conveyed, the transaction in its entirety cannot be upheld. In other words, to the extent that the value of the property exceeded the amount of the debt extinguished, the conveyance in equity was voluntary as to Brenner's creditors, although the parties did not so understand it at the time. It was, then, upon the assumption stated, constructively fraudulent, notwithstanding the actual good faith and honest intention, both of the grantor and grantee, in making a conveyance.

We advisedly say that we do not admit that the conveyance to Abramsohn was even constructively fraudulent, because we think that it is certainly fairly debatable that, under the facts disclosed by this record, the transaction could have been sustained in its entirety; but, because Abramsohn has voluntarily elected to surrender, and has actually surrendered, all claim to the property over and above the amount of his debt, there is no question left for discussion in this case, except to determine whether, in a court of equity, he will be permitted to retain sufficient of the property to compensate him for his debt, and because the strongest case that can be stated against Abramsohn is to say that he is a grantee with honest intentions who has in good faith done what the law prohibits, and is, therefore, constructively a fraudulent grantee. If we can show that such a grantee is, in equity, entitled to a lien to the extent of the *bona fide* consideration paid by him, we will have disposed of the entire case before the court.

*Boyd* v. *Dunlap*, 1 Johnston's Chancery, 478, is the leading American case on this subject. In that case, by a conveyance, a son had been preferred as a creditor, and the value of the land conveyed exceeded the debt by a considerable amount, yet it was held that the son was entitled to a lien for the actual debt. In the case last cited the chancellor said: "A deed fraudulent in fact is absolutely void, and is not permitted to stand as a security for any purpose of reimbursement or indemnity, but it is otherwise with a deed obtained under

suspicious or unequitable circumstances, or which is only constructively fraudulent.'' In *Herne* v. *Meeres*, 1 Vern., 465, this last rule of equity is applied to a case like the present. A purchase at a great undervalue, and with other ill circumstances along with it, was set aside on terms in favor of creditors. The lord chancellor observed: '' That at law where a conveyance is found to be fraudulent the creditor comes in and avoids all, without repayment of any consideration money, but in equity, where the court can decree the principal and interest, there is no hurt done, and a lesser matter in such a case will serve to set a conveyance aside, and he accordingly decreed the purchaser to reconvey upon payment of the consideration with interest.''

The numerous cases which follow the lead of *Boyd* v. *Dunlap*, *supra*, are collated in an admirable note which will be found in 36 Lawyers' Reports, annotated, 354, which we refer to as being preferable to extending this brief, as would be required if we undertook to quote all the decisions on this subject.

In speaking of conveyances partially voluntary, Bump says: ''A court of equity can do full justice to all parties by allowing the deed to stand as security for the consideration actually paid, and appropriating the balance to the payment of the vendor's debts. If there is any difference between the price paid and the actual value of the property courts of equity will, therefore, regard the conveyance to the extent and the difference as voluntary.'' Bump on Fraudulent Conveyances, 288, 289. The case of *Boyd* v. *Dunlap*, *supra*, was followed in *Redfield* v. *Hughes*, 67 Miss., 479, where the conveyances falsely recited a cash consideration, and the property was worth more than double the amount of the actual consideration.

Before closing we desire to say this much additional as to the actual good faith of Abramsohn in making the purchase. His attorney, Mr. Stone, has testified most positively that his honest judgment at the time was that he was not getting any property in excess of the amount of Abramsohn's principal debt, in-

interest, and attorney's fee.    In the case of *Davis* v. *Schwartz*, 165 U. S., 631, in speaking of a mortgage which was given for a larger amount than was due, Mr. Justice Brown, at page 645, says: "In all such cases the question of good faith is one of fact, and a mere error of judgment will not be imputed as a fraud."    Again, the chancellor has passed upon all the facts, and rendered his decree in favor of the *bona fides* of the transaction, therefore, under the doctrine announced in the *Interstate Cattle Co.* v. *Lipsey*, 2 Miss. Dec., 62, his decision should now be taken as conclusive on this point.

Argued orally by *Calvin Perkins*, for appellee.

WHITFIELD, J., delivered the opinion of the court.

The jurisdiction is abundantly sustained by *Bishop* v. *Rosenbaum*, 58 Miss., 84, and *Pollock* v. *Okolona Savings Inst.*, 61 Miss., 293.

On the merits, we rest our decision upon the distinct ground that the proof satisfactorily shows that the goods were not actually worth more than the debt due appellee.    It is perfectly obvious, from the testimony of Dancey, that Allen's bid was not for the value of the goods alone, but also for what it would be worth to him to prevent the sale of this bankrupt stock in Dublin at or below cost.    The highest bid really made for the goods, as such, was the sum of $2,500.    Allen had been told by Dancey that they would be sold, and Dancey had then told Abramsohn what he had told Allen, and Abramsohn, acting on this knowledge, was simply forcing Allen to bid all he could be made to bid, not to get the goods only, but to keep off this disastrous competition.    That is the real situation—one not foreseen, nor reasonably to be foreseen, by Abramsohn's agent, Stone, at the time of the purchase of the stock by him in extinguishment of Abramsohn's debt.

We put our decision on this express ground, not sanctioning the doctrine of *ex post facto* purgation of fraud.    A transaction

stamped by the vitiating element of actual fraud at the time
remains such, as to that particular transaction, always, and a
doctrine that such a transaction can be purged of its fraud by
matter *ex post facto*, and become itself (that particular transac-
tion) honest, is abhorrent to any enlightened system of juris-
prudence.    It simply puts a premium upon fraud.

But there was no actual fraud here, and Abramsohn's pur-
pose was to get his just debt, and that was what, in fact, at
that time, he got.    The surplus beyond that value—the price
of what it was worth to Allen to keep out this disastrous com-
petition—he is not entitled to and does not claim.

*Affirmed.*